IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DENNIS JONES, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:11-CV-2153-D |
| VS. | § | |
| | § | |
| DALLAS COUNTY, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In this action alleging claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. §§ 1981 and 1983, and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code Ann. §§ 21.001-21.556 (West 2006), and for intentional infliction of emotional distress ("IIED") under Texas common law, six defendants move for summary judgment on the claims brought against them in their individual capacities. Dallas County also moves for summary judgment. For the following reasons, the court grants the individual defendants' motion for summary judgment and dismisses the actions against them by Fed. R. Civ. P. 54(b) final judgment; it dismisses plaintiffs' official-capacity claims against the individual defendants; and it grants Dallas County's motion as to all of plaintiffs' claims except their hostile work environment claims.

I

In this lawsuit, three plaintiffs—Dennis Jones ("Dennis"), R.L. Lawson ("Lawson"), and Clarence Jones ("Clarence")—sued Dallas County and the Dallas County Commissioners Court ("Commissioners Court"),[1] and seven individual defendants: Mattye Mauldin-Taylor, Ph.D. ("Mauldin-Taylor"), Shannon Brown ("Brown"), Dale Lilley ("Lilley"), Darrell Howerton ("Howerton"), Terry Glynn Jones ("Terry"), and Paul Wright ("Wright") (collectively, the "Individual Defendants"), and David Womble ("Womble").[2] Dallas County Facilities Management ("Facilities Management"), which is administered by the Commissioners Court, is the institution charged with managing a complex of four Dallas County jail properties.   At all relevant times, Dennis was employed as a maintenance technician for Facilities Management, and Lawson and Clarence were employed as building mechanics.

Plaintiffs allege that, during their employment, they were subjected to discrimination and harassment based on race, a hostile work environment, disparate terms and conditions of employment, retaliation, and IIED.  They seek relief under Title VII, 42 U.S.C. §§ 1981 and 1983, the TCHRA, and Texas common law.

In *Jones v. Dallas County*, 2014 WL 1632154 (N.D. Tex. Apr. 23, 2014) (Fitzwater,

---

[1]The court does not suggest by referring to the Commissioners Court as a defendant that it is a jural entity that is separate from Dallas County itself.

[2]The court refers to Womble separately because the court has already dismissed the claims asserted against him in his individual capacity and entered a final judgment in his favor under Rule 54(b), and because he is represented by separate counsel.

C.J.) ("*Jones II*"), the court dismissed plaintiffs' § 1983 claims against the Individual Defendants in their individual capacities based on qualified immunity. *Id.* at *6. The court also dismissed plaintiffs' IIED claims asserted against Mauldin-Taylor, Lilley, and Wright to the extent based on the allegation that these defendants threatened to terminate Dennis' employment if he did not take a polygraph test. *Id.* In *Jones v. Dallas County*, 2013 WL 6388441, at *4-8 (N.D. Tex. Dec. 6, 2013) (Fitzwater, C.J.) ("*Jones I*"), and *Jones II*, 2014 WL 1632154, at *7-8, the court also dismissed the claims that plaintiffs asserted against Womble in his individual capacity. And in *Jones II*, 2014 WL 1632154, at *9, the court granted judgment in Womble's favor and entered a Rule 54(b) final judgment.

The Individual Defendants now move for summary judgment dismissing plaintiffs' remaining IIED claims asserted against them in their individual capacities. Dallas County moves for summary judgment dismissing all claims brought against it. Plaintiffs oppose both motions.

II

Because plaintiffs will bear the burden of proof on their claims at trial, defendants can meet their summary judgment obligations by pointing to the absence of admissible evidence to support the claim in question. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once defendants do so, plaintiffs must go beyond their pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Plaintiffs' failure to produce proof as to

any essential element of a claim renders all other facts immaterial.  *See TruGreen Landcare,*

*L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.) (citations omitted).

Summary judgment is mandatory if plaintiffs fail to meet this burden.  *See Little*, 37 F.3d at

1076.

## III

The court turns first to the Individual Defendants' motion for summary judgment.

## A

The Individual Defendants move for summary judgment dismissing plaintiffs' IIED

claims asserted against them in their individual capacities.  They maintain that some of

plaintiffs' IIED allegations overlap their claims of racial discrimination and are preempted

by federal law.  Concerning the remaining IIED allegations, the Individual Defendants

contend, *inter alia*, that plaintiffs have failed to allege conduct that can be characterized as

extreme and outrageous, beyond all possible bounds of decency, or utterly intolerable in a

civilized community, and that no evidence supporting any allegation establishes that any

particular plaintiff experienced severe distress.

Plaintiffs respond[3] that the summary judgment evidence would permit a reasonable

---

[3]Plaintiffs have failed in certain respects to comply with the local civil rules of this
court.  For example, they have included all of the evidence in opposition to the Individual
Defendants' motion for summary judgment in their response.  N.D. Tex. Civ. R. 56.4(a)
requires that a response to a motion for summary judgment "state in *reasonably concise*
*terms* why the responding party opposes the motion." (emphasis added).  Rule 56.6(a)
provides that "[a] party who relies on materials in the record—including depositions,

jury to find that Lilley and Mauldin-Taylor intentionally inflicted emotional distress on

Lawson, and that Wright intentionally inflicted emotional distress on Dennis.[4]

B

To prevail on a claim for IIED under Texas law, "a plaintiff must prove that (1) the

defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and

outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the

emotional distress suffered by the plaintiff was severe." *Randall's Food Mkts., Inc. v.*

*Johnson*, 891 S.W.2d 640, 644 (Tex. 1995) (citation omitted).

To establish that the defendant acted intentionally or recklessly, the plaintiff must

---

documents, electronically stored information, affidavits, declarations, stipulations, admissions, interrogatory answers, or other materials—to . . . oppose a motion for summary judgment must include the materials in an appendix." Instead of filing the required appendix in support of their summary judgment response, plaintiffs cite two separate evidentiary appendixes submitted in support of previous filings. Nevertheless, with considerable effort, the court has worked with the documents plaintiffs have submitted in an effort to decide defendants' motions fairly and justly to both sides. The court emphasizes that its local civil rules are not simply technical niceties that can be disregarded without cost. They are designed to conform the briefing and decisional processes to the goal of Fed. R. Civ. P. 1: "to secure the just, speedy, and inexpensive determination of every action and proceeding." When, as here, they are disregarded, there is a cost—in this instance, the burden placed on the court in deciding the summary judgment motions.

[4]In *Jones I* the court dismissed plaintiffs' IIED claim asserted against Womble, *Jones I*, 2013 WL 6388441, at *8, and in *Jones II* the court dismissed plaintiffs' IIED claims based on alleged threats by Mauldin-Taylor, Lilley, and Wright to terminate Dennis' employment if he did not take a polygraph test, *Jones II*, 2014 WL 1632154, at *6. To the extent plaintiffs intended to assert IIED claims based on allegations included in their fourth amended complaint, or in their Rule 7(a) reply, that the court did not address in *Jones I* or *Jones II* and that plaintiffs do not address in their response brief, the court concludes that plaintiffs have abandoned these bases for IIED claims.

prove that "severe emotional distress" was "the intended consequence or primary risk" of the defendant's actions. *Vaughn v. Drennon*, 372 S.W.3d 726, 732 (Tex. App. 2012, no pet.) (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 67 (Tex. 1998)). To prove that the defendant's conduct was "extreme and outrageous," the plaintiff must demonstrate that the defendant's conduct was "beyond all possible bounds of decency," "atrocious," and "utterly intolerable in a civilized society." *Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 610 (Tex. 2002) (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)) (internal quotation marks omitted). "Conduct that is merely insensitive or rude is not extreme and outrageous." *Id.* (citing *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999)). "Likewise, 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct.'" *Id.* (citing *GTE Sw.*, 998 S.W.2d at 612). "Initially, the court must decide 'whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.'" *Id.* (quoting *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993)). "Only when reasonable minds may differ is it for the jury, 'subject to the court's control, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.'" *Id.* (quoting *GTE Sw.*, 998 S.W.2d at 616). To establish "severe emotional distress," the plaintiff must prove "distress that is so severe that no reasonable person could be expected to endure it." *GTE Sw.*, 998 S.W.2d at 618. "The plaintiff must show more than mere worry, anxiety, vexation, embarrassment, or anger." *Williams v. First Tenn. Nat'l Corp.*, 97 S.W.3d 798, 805 (Tex. App. 2003, no pet.).

- 6 -

C

The court turns initially to Lawson's IIED claims against Lilley and Mauldin-Taylor. Plaintiffs contend that a reasonable jury could find that Lilley and Mauldin-Taylor attempted to bribe Lawson with a higher-paying position within the same department in exchange for Lawson's abandoning his Equal Employment Opportunity Commission ("EEOC") charges, and that such behavior exceeded all possible bounds of decency and was atrocious and utterly intolerable in a civilized community.  Plaintiffs maintain that Lilley and Mauldin-Taylor

> knew Lawson had previously applied for management positions, was qualified and that they didn't consider him [and] [t]hey knew that when they offered Lawson a management position on Jul[y] 21, 2011 in exchange for abandoning the harassment, discrimination and retaliation claims he had filed the day before . . . they were exerting severe distress upon him.  They hoped the distress would force Lawson to choose being immediately elevated to a position that would improve his personal finances, over pursuing a remedy for himself and all black workers in Facilities Management for overt, daily, severe race-based harassment, discrimination and retaliation that showed no signs of stopping.

Ps. Indiv. Ds. Mot. Br. 5.

Setting aside whether a reasonable jury could find that the alleged conduct was "extreme and outrageous," as Texas law requires, the court holds that a reasonable jury could not find from the summary judgment evidence that Lawson suffered "severe emotional distress" as a result of Lilley and Mauldin-Taylor's actions.  The only evidence that plaintiffs rely on to establish "severe emotional distress" is the affidavit of Lawson, in which he states: "Dallas County's refusal to consider me for management has made my life difficult to

provide for my family, my bills, repay my college loans.  If I could have progressed in [my] career, I would have not suffered eviction, loss of vehicles, resulting poor credit and higher interest rates."  Ps. Womble Resp. App. 9.[5]  Not only does this evidence fail to describe a type of "distress that is so severe that no reasonable person could be expected to endure it," *GTE Sw.*, 998 S.W.2d at 618, as Texas law requires, it simply describes the "difficult[ies]" that Lawson experienced as a result of Dallas County's *refusal to consider him for a management promotion*.  The evidence does not mention any type of "severe distress" that Lawson allegedly suffered as a result of Mauldin-Taylor and Lilley's allegedly attempting to bribe him so that he would abandon his EEOC claim.  Because plaintiffs have failed to create a genuine issue of material fact on whether Lawson experienced "severe emotional distress" as a result of the conduct that serves as the basis for Lawson's IIED claims against Lilley and Mauldin-Taylor, the Individual Defendants are entitled to summary judgment dismissing these claims.

## D

The court next considers plaintiffs' allegations that Wright intentionally inflicted emotional distress on Dennis.  In support of this claim, plaintiffs rely on evidence that, around August 2012, Wright "threatened [Dennis] by saying 'Watch your back,' and 'Be

---

[5]In responding to Dallas County's summary judgment motion, plaintiffs have failed to comply with the local civil rules.  *See supra* note 3.  Because all of the relevant evidence on which plaintiffs rely in support of their summary judgment response can be found in the appendix in support of their response to Womble's motion for judgment on the pleadings, the court's citations to "Ps. Womble Resp. App." refer to that document.

careful walking to your car.'"  Ps. Indiv. Ds. Mot. Br. 6.[6]  Plaintiffs allege that Wright's

physical threats "caused [Dennis] great stress, and a jury will find these types of threats by

a supervisor against a worker under the circumstances of this case to be outrageous conduct

that intentionally inflicts emotional distress."  *Id.*

As explained in *Jones I*,

> [u]nder Texas law, a plaintiff may not bring an IIED claim when
> other statutory remedies are available for the underlying
> conduct.  IIED is a gap-filler tort never intended to supplant or
> duplicate existing statutory or common-law remedies.  Even if
> other remedies do not explicitly preempt the tort, their
> availability leaves no gap to fill.  Therefore, courts have found
> that employees' IIED claims against supervisors are precluded
> when there are other statutory remedies available against the
> employer.

*Jones I*, 2013 WL 6388441, at *7 (citations and internal quotation marks omitted).  In

support of their IIED claims against Wright, plaintiffs rely on Dennis' affidavit, in which he

avers:

> I run all the buildings at night, by myself, and I do feel
> intimidated and unsafe about what's going on.  I look over my
> shoulder.  I try to get things done during daylight because *I
> don't know what they will do now that I'm bringing this suit.*
> There are a lot of old, dark buildings with a lot of corners, and
> I have to go on these dark floors alone.  The intimidation stems
> from never knowing what racial event is going to happen in the
> work environment each day.  *I wonder if one of the white*

---

[6]Because in this memorandum opinion and order the court is citing plaintiffs' brief in
support of their response to the Individual Defendants' motion for summary judgment, their
response to Dallas County's motion for summary judgment, and their brief in support of that
response, it will designate the document it is citing as "Ps. Indiv. Ds. Mot. Br.," "Ps. Dallas
Cnty. Mot. Resp.," or "Ps. Dallas Cnty. Mot. Br.," as appropriate.

> *supervisors is going to retaliate further against me. . . .* It has
> put me on guard that Paul Wright has said to me, "Be careful
> walking back to your car" and "Watch your back." Again, he
> never said that before and I know he is sitting up there with the
> other white supervisors and racism really exists with them.

Ps. Womble Resp. App. 23-24 (emphasis added). In their fourth amended complaint,[7]

plaintiffs allege:

> Individual Defendants intentionally inflicted emotional distress
> upon Plaintiffs by subjecting them to fear of physical attack *on
> the basis of race and in retaliation for making discrimination
> complaints*. At least one Plaintiff has been subjected to veiled
> threats since complaining of discrimination, such as "Be careful
> walking to your car," "Watch your back," and "Take care of
> yourself."

4th Am. Compl. ¶ 93. It is clear from the averments in Dennis' affidavit and the allegations

of the fourth amended complaint that plaintiffs are "attempting impermissibly to predicate

[Dennis'] IIED claim on the same conduct which underpins" their discrimination and

retaliation claims. *Muniz v. El Paso Marriott*, 2009 WL 4878619, at *3 (W.D. Tex. Dec. 8,

2009) ("Under Texas law, a claim for IIED is not available against an employee's supervisor

if the same alleged conduct supports a claim for relief against the employer under other legal

theories, such as the anti-discrimination statutes."). Dennis' averments regarding the alleged

threats are made in the context of his explanation of the race-based harassment he allegedly

---

[7]On December 28, 2013 plaintiffs filed a fifth amended complaint (which was entitled "Fourth Amended Complaint"), which they withdrew on January 3, 2014. They then filed on January 4, 2014 a "Fourth Amended (Corrected) Complaint," which they withdrew on January 29, 2014. Accordingly, the fourth amended complaint, in combination with the Rule 7(a) reply, is plaintiffs' operative pleading.

experienced and his fear of "further" retaliation as a result of filing this lawsuit. These same allegations form the basis of plaintiffs' discrimination and retaliation claims.

Accordingly, the allegation that Wright threatened Dennis in approximately August 2012 is preempted and cannot support plaintiffs' IIED claims as a matter of law. *See Jones I*, 2013 WL 6388441, at *7-8.

E

Plaintiffs also rely in support of their IIED claims on contentions that, on November 5, 2012, Wright sent Dennis to Internal Affairs for questioning about whether Dennis was distributing a copy of a bulletin the Dallas County Sheriff's Office issued to warn people that Womble was not permitted on Facilities Management property; Wright again held Dennis for questioning on November 7, 2012 regarding whether he had distributed the bulletin; and, on November 15, 2012, Lilley gave Dennis a written reprimand for leaving the November 7, 2012 meeting without Wright's having "dismissed" him. Plaintiffs allege that on November 13, 2012 a doctor reported that Dennis "must be off work to rest and see the specialist for escalation," and on November 28, 2012 a second doctor reported that Dennis was "[c]urrently elevated on exam today. Suspect stress at work[.]" Ps. Indiv. Ds. Mot. Br. 6-7.

A reasonable jury could not find that Wright's sending Dennis to Internal Affairs for investigation of a work-related issue, questioning him two days later regarding the same issue, and Lilley's issuing a written reprimand when Dennis left the meeting before he was excused constitute "extreme and outrageous" conduct sufficient to establish IIED. *Compare*

*GTE Sw.*, 998 S.W.2d at 613, 617 (holding that evidence that supervisor "greatly exceeded the necessary leeway to supervise, criticize, demote, transfer, and discipline, and created a workplace that was a den of terror for the employees" by engaging in a pattern of "grossly abusive, threatening, and degrading conduct" over a period of two years was sufficient to support finding of "extreme and outrageous" conduct), *with Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 817-18 (Tex. 2005) (holding that post-termination conduct including refusing to give plaintiff a reference letter, declining to take reference calls on plaintiff's behalf during business hours, and instructing another employee to evict plaintiff did not constitute "extreme and outrageous" conduct, and noting that "except in circumstances bordering on serious criminal acts . . . such acts will rarely have merit as intentional infliction claims."). Wright's investigation and Lilley's reprimand of Dennis, who was their employee, is not the type of "extreme and outrageous" conduct "bordering on serious criminal acts" that Texas courts require to support an IIED claim. *See Creditwatch, Inc.*, 157 S.W.3d at 818. Accordingly, this basis for plaintiffs' IIED claims fails as a matter of law.

F

Because plaintiffs have failed to meet their summary judgment obligation with respect to their IIED claims asserted against defendants Mauldin-Taylor, Lilley, and Wright in their individual capacities, the court grants the Individual Defendants' motion for summary judgment and dismisses plaintiffs' IIED claims in their entirety as to the Individual Defendants.

IV

The court now turns to Dallas County's motion for summary judgment. Dallas County moves for summary judgment dismissing plaintiffs' hostile work environment claims under Title VII, §§ 1981 and 1983, and the TCHRA. It maintains that the alleged incidents of race-based harassment were neither severe nor pervasive, and that, other than the incident involving Womble, there is no evidence that any incident was committed by any of plaintiffs' supervisors or that Dallas County knew about the incidents and failed to take prompt remedial action.

A

Section 1983 and Title VII are "parallel causes of action." *Cervantez v. Bexar Cnty. Civil Serv. Comm'n*, 99 F.3d 730, 734 (5th Cir. 1996). The "inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citing *Briggs v. Anderson*, 796 F.2d 1009, 1019-21 (8th Cir. 1986)). Courts use the same legal framework to analyze claims brought under Title VII and § 1981. *See DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007). "Similarly, the law governing claims under the TCHRA and Title VII is identical." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (citation omitted). Accordingly, the court will analyze together plaintiffs' hostile work environment claims under Title VII, §§ 1981 and 1983, and the TCHRA.

"A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment.'" *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).  Generally, to establish a prima facie case of a hostile work environment, a plaintiff must show the following:

> (1) [he] belongs to a protected group; (2) [he] was subjected to unwelcomed harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (citations omitted).

"Harassment is based on race if 'the complained-of conduct had a racial character or purpose.'" *King v. Enter. Leasing Co. of DFW*, 2007 WL 2005541, at *10 (N.D. Tex. July 11, 2007) (Fitzwater, J.) (quoting *Harris-Childs v. Medco Health Solutions, Inc.*, 2005 WL 562720, at *6 (N.D. Tex. Mar. 10, 2005) (Means, J.)).  Plaintiffs must demonstrate a "connection between the allegedly harassing incidents and [their] protected status." *Id.* (alteration, citation, and internal quotation marks omitted).  "For harassment on the basis of race to affect a term, condition, or privilege of employment . . . it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey*, 286 F.3d at 268 (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Additionally, the work environment must be "both objectively and subjectively

- 14 -

offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris*, 510 U.S. at 21-22). "In determining whether a workplace constitutes a hostile work environment, courts must consider the following circumstances: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Ramsey*, 286 F.3d at 268 (quoting *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000)).

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998). Merely offensive conduct is not actionable. *See Harris*, 510 U.S. at 21.

### B

Plaintiffs rely on the following evidence of race-based harassment: (1) on February 2, 2011 Dennis' employment was terminated because he had a pre-employment felony conviction, even though he disclosed this conviction when he applied for the position with Dallas County, and Caucasian and Hispanic ex-felons were not similarly terminated; (2) in November 2010 Dennis and Lawson witnessed Womble "strut[ting]" around a staff meeting

attended by Facilities Management employees and managers wearing fake metal teeth and saying "I got my bling," and "[t]his is how we do it in the hood," in an apparent mockery of African-Americans in general and Lawson in particular on account of his race, Ps. Womble Resp. App. 7, 20; (3) from November 2010 until April 2011, a "[l]ynching [e]ffigy," Ps. Dallas Cnty. Mot. Br. 10, constructed of a Coke Zero can[8] hung by a noose was permitted to remain hanging in a Facilities Management common area and was viewed by Lawson; (4) around November 2010, for three to four days, instructions were posted on a workplace bulletin board drawn inside a caricature of an African-American male with an Afro, goatee, and gold tooth; (5) during a meeting involving mostly minority shift workers, including Lawson and Clarence, "supervisors" stated that if they found anyone doing things they were not supposed to do, "[w]e are going to whoop your ass," Ps. Womble Resp. App. 8, and Womble threatened that people who did not do their job would be taken to the boiler room and beaten up; (6) during department meetings attended by Clarence and Lawson, Womble ridiculed African-American workers on the basis of race and told homosexual jokes about an African-American employee ; (7) on two occasions Womble played, in the presence of Dennis, a cell phone animation of a cooked and dressed turkey with the head of an African-American man that said, "gobble, gobble, ni---r, ni---r, ni---r,"[9] *id.* at 21; and (8) in 2012

---

[8]This item is referred to in the summary judgment record as a "black" Coke Zero can. Because Coke Zero cans are by design largely black in color, the court will refer to this item as the "Coke Zero can."

[9]In this memorandum opinion and order, the court uses the redaction "ni---r" in place of the actual term.  Accordingly, the court will not hereafter indicate that the term has been

Clarence discovered graffiti with the words "White Power" painted on the walls of the Decker Jail facility, and the graffiti was not removed until the next day.

Plaintiffs also allege that Womble "terrorized black workers" by returning to work at night to watch minority employees after hours, P. Dallas Cnty. Mot. Resp. 8, but they rely only on Clarence's purely speculative statement in his affidavit to support this allegation. Plaintiffs also assert that Howerton, Terry, Lilley, and Womble enforced a system of harassment that included intimidating sessions known as "Monday Meetings," during which African-American workers were not permitted to speak and were ridiculed on the basis of race including by directing sexual comments toward African-American workers and referring to them as "bitch," *id.* at 9. Plaintiffs fail, however, to cite evidence in support of these allegations, and the court will neither consider nor discuss them further.

C

The court concludes that a reasonable jury could not find a hostile work environment based on the termination of Dennis' employment.

To give rise to an actionable hostile work environment claim, the complained-of conduct must be "based on race," meaning that it "had a racial character or purpose." *King*, 2007 WL 2005541, at *10. A reasonable jury could not find that Dennis' February 2, 2011 termination was based on race. The only evidence that plaintiffs have adduced in this respect is Dennis' statement in his EEOC complaint of his subjective belief that "I believe I have

altered.

been discriminated against because of my race," Ps. Womble Resp. App. 67, and his affidavit testimony in which he recounts a conversation with a supervisor in which he asserted that Caucasian and Hispanic employees were allowed to continue working despite prior felony convictions.

> In 2010 Darrell Howerton, who is a white supervisor, came up to me in a morning meeting and said, "Dale Lilley and David Womble are terminating you. I need your badge, and I need you to sign these papers." I said, "I am not signing anything." He said, "You lied about your background." I said, "No, I reported I had a felony when I applied in 2008." And he said they decided to terminate me. I said, There are white and Hispanic felons still working. I was told the police department does not want any [ex-]felons working in the Dallas County Jails and they had to let me go. There are [ex-]felons that [were] still working there when they let me go.

*Id.* at 21. Dennis' subjective belief and his unsubstantiated assertion that Caucasian and Hispanic felons were permitted to continue working for Dallas County are insufficient to enable a reasonable jury to find that Dallas County terminated his employment based on race. Moreover, plaintiffs have not introduced sufficient evidence for a reasonable jury to find that Dennis' termination created a hostile work environment for any plaintiff.

D

The court concludes that a reasonable jury could not find a hostile work environment based only on the November 2010 incident in which Dennis and Lawson observed Womble at a staff meeting attended by Facilities Management employees and managers wearing fake metal teeth, saying, "I got my bling," and "this is how we do it in the hood."

Plaintiffs' evidence would only enable a reasonable jury to find that, on one occasion

in 2010, during a departmental meeting, Womble put fake metal teeth in his mouth, "strut[ted]," and stated, "I got my bling," and "[t]his is how we do it in the hood."  Ps. Womble Resp. App. 7, 20.  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (quoting *Faragher*, 524 U.S. at 788) (internal quotation marks omitted). According to the summary judgment evidence, this incident did not physically threaten anyone, including any plaintiff, and it occurred only once.  A reasonable jury could not find that this conduct alone constituted severe or pervasive harassment that altered the conditions of a plaintiff's employment.

E

Nor could a reasonable jury find a hostile work environment based only on the incident in November 2010 when, for three to four days, instructions were posted on a workplace bulletin board drawn inside a caricature of an African-American male with an Afro, goatee, and gold tooth.  Plaintiffs contend that Lawson had an Afro, goatee, and gold tooth at the time the caricature appeared, and they maintain that the caricature is "racist."  Ps. Dallas Cnty. Mot. Resp. 8.  But they fail to offer evidence that would enable a reasonable jury to find that the caricature amounted to anything more than an isolated incident.  And given plaintiffs' contention that Lawson in fact had an Afro, goatee, and gold tooth, it is questionable whether a reasonable jury could even find that the caricature was intended as a racially offensive stereotype of African-American males generally.  The jury could not

- 19 -

reasonably find that this was an extremely serious incident that would alone amount to discriminatory changes in the terms and conditions of plaintiffs' employment.[10]

### F

A reasonable jury would also be unable to find the existence of a racially hostile work environment based on alleged threats made during a meeting involving mostly minority shift workers, including Lawson and Clarence.

Plaintiffs maintain that "supervisors" stated that, if they found anyone doing things they were not supposed to do, "[w]e are going to whoop your ass," Ps. Womble Resp. App. 8; and "Womble said that people who don't do their job are going to be taken to the boiler room and beaten up." *Id.* at 51. But plaintiffs have adduced no evidence that these statements were targeted at African-American employees in particular. There is no proof, for example, that the statements were race specific, or that the speaker made race-neutral comments but directed them toward the African-Americans in the room. Plaintiffs' contention that this was a "race-based threat" because "that meeting was concerning shift workers, and *the majority* of shift workers at that time were minorities," *id.* at 8 (emphasis added), is insufficient to create a genuine fact issue. *Cf. Johnson v. BAE Sys. Land & Armaments*, L.P., 2014 WL 1714487, at *17 (N.D. Tex. Apr. 30, 2014) (Fitzwater, C.J.) (holding that supervisor's comment that he would whip employees if they did not get to work

---

[10]Plaintiffs also rely on evidence that someone wrote "Greg Gay 1-800-I like d[--]k," Ps. Womble Resp. App. 7, on the caricature, but the addition of this offensive writing does not change the court's conclusion.

was facially race-neutral, but when viewed in context, reasonable trier of fact could infer a racial connotation because comment was made in presence of four African-Americans).[11]

And even if a reasonable jury could find that the statements were racial in nature, it could only find that the statements reflect an isolated incident that was not extremely serious and did not amount to discriminatory changes in the terms and conditions of plaintiffs' employment.

G

The court holds that a reasonable jury could not find the existence of a racially hostile work environment based on plaintiffs' evidence that, during department meetings attended by Clarence and Lawson, Womble ridiculed African-American workers on the basis of race and told homosexual jokes about a particular African-American employee.

Plaintiffs cite the affidavit of Larry Simpson ("Simpson"), who avers that "Womble was making a wide variety of inappropriate comments that were racist in nature and some even to be threatening." Ps. Womble Resp. App. 40. They also rely on Lawson's affidavit, in which he states:

> Womble shows these strong racial ideologies to be part of his make-up. What I mean by that is he employs racist thinking about people of ethnic groups. He loves to tell jokes about them, demean them, bully and intimidate them. The brunt of David Womble's jokes fall on minorities and he likes to embody

---

[11]Plaintiffs also rely on evidence that "[a] form called a Hurt Feelings form with many copies was put out after offensive meetings. It was printed out as a joke to those who found the meeting offensive." Ps. Womble Resp. App. 51. They have not adduced any evidence that would enable a reasonable jury to find that this conduct was race-based.

his racist thinking in an act and carry it out.

*Id.* at 7.   But other than these general characterizations of Womble's conduct, neither Simpson nor Lawson provides the content of any alleged racist or inappropriate comments, jokes, or thinking.   This evidence is therefore conclusory, and it is insufficient to enable a reasonable jury to find that Womble in fact told racially-offensive jokes or made racist comments.   *See Ramsey*, 286 F.3d at 269 (holding that a conclusory allegation is "inadequate to satisfy the nonmovant's burden in a motion for summary judgment" (internal quotation marks omitted)).

As for Womble's alleged homosexual jokes about a particular African-American employee, there is insufficient evidence for a reasonable jury to find that these jokes were based on race or were sufficient to create a racially hostile work environment.

## H

Plaintiffs rely on evidence that Womble twice played in Dennis' presence a racially-offensive cell phone animation of a cooked and dressed turkey with the head of an African-American man that said, "gobble, gobble, ni---r, ni---r, ni---r."  Ps. Womble Resp. App. 21. A reasonable jury could not find that this conduct—albeit obviously offensive, but which only occurred twice—was alone sufficient to create a hostile work environment.

Plaintiffs fail to present evidence that this conduct was more than an isolated instance, or that would enable a reasonable jury to find that the conduct—which occurred twice in the span of a few weeks and is not alleged to have been repeated after the second time Dennis asked Womble to stop—was so objectively offensive as to alter plaintiffs' working

conditions.  *See, e.g., Frazier v. Sabine River Auth. La.*, 509 Fed. Appx. 370, 374 (5th Cir.

2013) (per curiam) (affirming summary judgment on hostile work environment claim where,

although there was evidence that coworker used the word "ni---r" in plaintiff's presence, it

was isolated instance and not severe or pervasive enough to support hostile work

environment claim); *Johnson v. TCB Constr. Co.*, 334 Fed. Appx. 666, 671 (5th Cir. 2009)

(per curiam) (affirming summary judgment on hostile work environment claim where,

"although [supervisor's] alleged comment to [employee] that he was just 'like a damn ni---r'

in asking for a raise [was] repulsive, it [was] isolated and [employee] has offered no evidence

concerning its objective effect on his 'work performance.'").[12]

I

Plaintiffs also rely on evidence that Clarence discovered graffiti with the words

"White Power" painted on the walls of the Decker Jail facility.  This evidence is likewise

alone insufficient to enable a reasonable jury to find that plaintiffs were subjected to a hostile

work environment.

Plaintiffs contend that, in 2012, Clarence discovered graffiti with the words "White

Power" painted on the walls of the Decker Jail facility, and that the graffiti was not removed

until the next day.  Although courts have determined that the presence of racist graffiti could

---

[12]Plaintiffs rely on *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572 (D.C. Cir. 2013) (per curiam), in which the plaintiff alleged that his employer's vice president shouted at him to "get out of my office ni---r," *id.* at 572, and the court stated that this conduct "might well have been sufficient to establish a hostile work environment," *id.* at 577.  But even if *Ayissi-Etoh* were binding on this court, which it is not, the facts of this case are distinguishable.

be sufficient to create a hostile work environment, they generally have done so when the graffiti is extensive, is combined with other harassing conduct, or contains threatening language. *See, e.g., EEOC v. Rock-Tenn Servs. Co.*, 901 F.Supp.2d 810, 825 (N.D. Tex. 2012) (Boyle, J.) (holding that fact issue precluded summary judgment on hostile work environment claim where there was evidence of graffiti over several years, including "KKK," swastikas, and phrases such as "ni---r, go home," "we coming to get you ni---rs," and "die ni---r die."). Plaintiffs allege that someone wrote the words "White Power" on the Decker Jail facility walls, and that Lilley had the graffiti removed the next day. This evidence is insufficient to enable a reasonable jury to find that this graffiti was so severe or pervasive as to alter plaintiffs' working conditions, or that it was anything other than an isolated occurrence. Alternatively, the fact that the graffiti was removed the following day would undermine plaintiffs' ability to prove the fifth element of their hostile work environment claims: that Dallas County failed to take prompt remedial action.

J

Plaintiffs maintain that they were subjected to a racially hostile work environment when a Coke Zero can suspended by a string was permitted to remain on display from November 2010 until April 2011. Dallas County maintains that this evidence "do[es] not bespeak of a racial animus or bias" because "no reasonable person would find a 'racial' element in this incident." D. Br. 8. Plaintiffs respond with evidence that Clarence, Lawson, and other employees who viewed the suspended Coke Zero can thought it represented the lynching of an African-American and found it offensive.

1

Plaintiffs have introduced the following summary judgment evidence concerning this incident.  According to Lawson,

> a black Coke can was hung in the highest point of all the boxes in the meeting room, and the can was hanging perfectly straight up and down, like it was being lynched.  Everyone was saying things like, "Would you look at this [sh-t]?  Who do these people think they are[.]"  I think the can was placed in retaliation for my filing a discrimination complaint because it never existed before I filed a grievance.

Ps. Womble Resp. App. 8.[13]  Henry Torres averred that

> [i]t was a Black soda can hanging inside of the box on a string for a long time and then, it suddenly disappeared.  [Lawson] definitely took it as a Black being.  I believe it was a [subtle] message of a Black being hung, that's how I took it.  I don't remember if another Black was offended but, it appeared Blacks were uneasy and felt uneasy about asking questions.

*Id.* at 41-A.

Israel Garza ("Garza") stated: "I was a witness [to] the can hanging.  I believe it was inappropriate and I was offended by it.  When I saw it, my first interpretation was that it implied they were hanging a Black."  *Id.* at 43.

Clarence averred in his affidavit that "a hanging noose was put up in the office with a black soda can in the noose . . . so it looked like a black person hanging.  The string or yarn

---

[13]Lawson's speculation that the can was hung in retaliation for his filing a discrimination complaint is not supported factually, and it appears to rest on nothing more than the temporal proximity between Brown's investigation of Lawson's complaint and the appearance of the Coke Zero can.

was white." *Id.* at 50-51.[14]

The summary judgment evidence is unclear regarding where the can was displayed. Lawson's affidavit states that it was hanging in the "meeting room," *id.* at 8, but his EEOC complaint says it was hanging in the "north tower engine room," *id.* at 25.  Plaintiffs also cite evidence that it was hanging in the "North Tower Maintenance management's office," *id.* at 41-A, and that it was displayed in the "Managers['] . . . office," *id.* at 44.  But there is support in the record for a reasonable jury to find that the can was on display from November 2010 until April 2011; that two of the three plaintiffs[15] either observed or learned about it; and that the Coke Zero can was permitted to remain hanging for between six weeks and six months.

2

Dallas County maintains that plaintiffs have failed to present evidence of a hostile work environment because the display of the Coke Zero can "do[es] not bespeak of a racial animus or bias" because "no reasonable person would find a 'racial' element in this incident."  D. Br. 8.  The court disagrees.

In *Carter v. Luminant Power Services Co.*, 2011 WL 6090700 (N.D. Tex. Dec. 6, 2011) (Lindsay, J.), Judge Lindsay addressed the alleged use in the workplace of terms associated with lynching.  The following explanation from *Carter* is helpful in understanding how an African-American employee might reasonably find a racial element in the Coke Zero

---

[14]Plaintiffs do not provide evidence that Clarence was a percipient witness.

[15]Plaintiffs present no evidence that Dennis ever saw or heard about the Coke Zero can incident.

can incident.

> It is common knowledge that many black men were lynched (illegally hanged) after the Civil War and well into the twentieth century for the commission or alleged commission of a crime, or for "getting out of their place." Therefore, any reference to the terms "hang(ed)," "hung," "rope," "noose," or the like, in the context described by [the plaintiff], can be reasonably interpreted to refer to an African-American man being illegally put to death, usually by a mob of misguided individuals seeking vigilante justice. It is fatuous for any reasonably intelligent person to not connect the use of such terms to an African-American male. The use of these terms in a discriminatory or racial manner, as described by [the plaintiff], even when purportedly used jokingly, serves *no* purpose in the workplace other than to foment and perpetuate invidious race discrimination.

*Id.* at *17.

Moreover, courts have recognized that "[t]he making of nooses is at least arguably objectively offensive, as it evokes the image of race-motivated lynching." *Bell v. Ingalls Shipbuilding, Inc.*, 207 F.3d 657, 2000 WL 122384, at *1 (5th Cir. 2000) (per curiam) (unpublished table decision) (reversing summary judgment in part). "The frequent making of nooses, coupled with the presence of allegedly offensive racial remarks and the presence of [Ku Klux Klan] graffiti at the worksite raise a fact issue regarding whether the work atmosphere . . . [is] racially hostile." *Id.* This court has relied on *Bell* to hold that the presence of nooses and offensive or threatening racial graffiti in the workplace was sufficient to create genuine issue of material fact concerning whether an employee's employment was affected. *See Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *27 (N.D. Tex. Dec. 12, 2008) (Fitzwater, C.J.), *aff'd sub nom.*, *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644 (5th

Cir. 2012).  The Fifth Circuit has also "held that African-American employees who testified to seeing wires in the shape of nooses and racially derogatory graffiti presented sufficient evidence for a reasonable jury to find that they experienced a hostile work environment." *Id.* (citing *Abner v. Kan. City S. R.R. Co.*, 513 F.3d 154, 167 (5th Cir. 2008)).  The court therefore rejects Dallas County's contention that the display of the Coke Zero can "do[es] not bespeak of a racial animus or bias" because "no reasonable person would find a 'racial' element in this incident."  D. Br. 8.

3

Nevertheless, Dallas County's position that plaintiffs have failed to present evidence of a hostile work environment is not necessarily unreasonable.  This is because the mere presence of a noose in the workplace is insufficient of itself to establish a racially hostile work environment.  For example, in *Carter* Judge Lindsay held that the plaintiff's discovery of a noose in the workplace was an isolated incident that was not severe or physically threatening or humiliating.  *Carter*, 2011 WL 6090700, at *30.  He pointed out that the noose was found in the bathroom of the break room; there was no evidence of any racially offensive graffiti, threatening displays or conduct, or references to the plaintiff in connection with the noose; and ropes were commonly used in the workplace for tag lines, air tuggers, and conveying tools from one elevation to the next.  *Id.* at *31.  Judge Lindsay contrasted the record in his case with decisions like *Bell* and *Wesley v. Yellow Transportation, Inc.*, emphasizing that those cases referred to "[t]he *frequent making of nooses,* coupled with the presence of allegedly offensive racial remarks and the presence of KKK graffiti at the

worksite[,] rais[ing] a fact issue regarding whether the work atmosphere . . . was racially

hostile." *Id.* (quoting *Bell,* 207 F.3d 657, 2000 WL 122384, at *1, and citing *Wesley v.*

*Yellow Transp., Inc.*, 2008 WL 294526, at *19 (N.D. Tex. Feb. 4, 2008) (Fitzwater, C.J.)).

There are decisions that have granted summary judgment where a noose was observed in the

workplace, but the exposure to the noose was isolated and was not accompanied by other,

similarly offensive conduct. *See Filer v. Donley,* 2011 WL 196169, at *7 (N.D. Tex. Jan. 20,

2011) (McBryde, J.) (granting summary judgment against employee whose supervisor

publicly displayed noose in his office because no rational jury could find abusive work

environment when plaintiff viewed noose only once, for a matter of a few minutes, and

noose was not displayed in a manner that was physically threatening to plaintiff or any other

African-American employees), *vacated and remanded on other grounds*, 690 F.3d 643 (5th

Cir. 2012); *Jimerson v. Garrett Aviation Servs., LLC*, 2010 WL 5067692, at *1, 4-5 (S.D.

Tex. Dec. 6, 2010) (holding that rope in shape of noose hanging from rafters at plaintiff's

workplace, that a coworker stated was to "wrap around [the][p]laintiff's neck," causing

plaintiff to fear for his life was insufficient to support hostile work environment claim,

because incident was isolated and not accompanied by physical contact, plaintiff did not flee

or seek help, and rope was commonplace fixture in workplace).

Based on the case law, it is questionable whether the Coke Zero can incident would

alone be sufficient to create a hostile work environment had it occurred in a workplace that

was largely devoid of other harassing or similarly offensive race-based conduct. But as the

court explains next, the jury must assess whether plaintiffs were subjected to a hostile work

environment based on the totality of the circumstances.  And there is evidence that would enable a reasonable jury to find that the Coke Zero can incident took place in a workplace in which other harassing or similarly offensive race-based conduct had occurred, and to view the Coke Zero can incident in a materially different (and hostile) light.

## K

The court now considers whether a reasonable jury could find from the totality of the circumstances that plaintiffs were subjected to a hostile work environment.

"Workplace conduct is not measured in isolation.  In order to deem a work environment sufficiently hostile, all of the circumstances must be taken into consideration." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citations and internal quotation marks omitted).  The court focuses on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct was physically threatening or humiliating, and the degree to which the conduct unreasonably interfered with an employee's work performance.  *See, e.g., Ramsey*, 286 F.3d at 268.  The question for the jury is not whether the racial conduct at issue was appropriate in the workplace or deserves condemnation.  The issue is whether, under the totality of the circumstances, the conduct was severe and pervasive enough to alter the terms and conditions of employment and create an abusive working environment.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21.

The acts on which plaintiffs rely that are racial in character, that are supported by

sufficient summary judgment evidence, and that are therefore properly considered when examining the totality of the circumstances are these: (1) on one occasion in 2010, during a departmental meeting, Womble put fake metal teeth in his mouth, "strut[ted]" around, and stated, "I got my bling," and "[t]his is how we do it in the hood"; (2) the Coke Zero can incident; (3) the posting for three to four days around November 2010 of instructions on a workplace bulletin board drawn inside a caricature of an African-American male with an Afro, goatee, and gold tooth; (4) Womble's twice playing in Dennis' presence a cell phone animation of a cooked and dressed turkey with the head of an African-American man that said, "gobble, gobble, ni---r, ni---r, ni---r"; and (5) Clarence's discovering graffiti with the words "White Power" painted on the walls of the Decker Jail facility, and which graffiti was not removed until the next day.  Although these acts might not be sufficient of themselves to establish a hostile work environment, a reasonable jury could find when considering the totality of the circumstances that they are.[16]

Given the horrific symbolism of a lynching to an African-American, the evidence that

_____

[16]The court does not suggest that plaintiffs are limited at trial to presenting only evidence regarding the Coke Zero can incident and the other evidence discussed here. Although it is the Coke Zero can incident, in combination with the other cited evidence, that is sufficient to establish a racially hostile work environment, there may be other proof that is probative of the totality of the circumstances and is relevant evidence under Fed. R. Evid. 401.  *See generally Hernandez*, 670 F.3d at 653 (discussing admissibility of evidence of harassment against individuals other than plaintiff's protected class, discrimination against workers other than the plaintiff, harassment of persons other than the plaintiff, and cross-category discrimination, and noting that, "before a workplace environment may be found sufficiently hostile, a wide array of considerations are to be examined." (citing *Ramsey*, 286 F.3d at 268)).

employees in fact perceived the Coke Zero can suspended by a string to represent an African-American being lynched at the end of a hangman's noose, the evidence that the display offended and adversely affected minority employees—including the plaintiffs—who observed or heard about it, the absence of any apparent nondiscriminatory reason for the Coke Zero can to be permitted to remain on display, and the evidence that the can was allowed to remain in a meeting room, an engine room, or another office where it could easily be observed, and that it was in fact displayed for an extended period (perhaps up to six months), combined with the other incidents of harassing or similarly offensive race-based conduct, a reasonable jury could find that plaintiffs were subjected to a racially hostile work environment.

L

The court now considers whether Dallas County can be held liable on plaintiffs' hostile work environment claims.

1

Dallas County contends that it is entitled to summary judgment because there is no evidence that any of the incidents—"other than perhaps the phone incident involving Womble," D. Br. 9—was actually committed by a plaintiff's supervisor, and there is no evidence that Dallas County knew about any other incident and failed to take prompt remedial action.  An employer can be held vicariously liable for workplace harassment by its employees.  The employer's liability, however, "may depend on the status of the harasser."  *Vance v. Ball State Univ.*, ___ U.S. ___, 133 S.Ct. 2434, 2439 (2013).

> If the harassing employee is the victim's co-worker, the
> employer is liable only if it was negligent in controlling working
> conditions.  In cases in which the harasser is a "supervisor,"
> however, different rules apply.  If the supervisor's harassment
> culminates in a tangible employment action, the employer is
> strictly liable.  But if no tangible employment action is taken,
> the employer may escape liability by establishing, as an
> affirmative defense, that (1) the employer exercised reasonable
> care to prevent and correct any harassing behavior and (2) that
> the plaintiff unreasonably failed to take advantage of the
> preventive or corrective opportunities that the employer
> provided.

*Id.* (citations omitted).  An employee qualifies as a supervisor only when the employer has

"empowered that employee to take tangible employment actions against the victim, *i.e.*, to

effect a 'significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits.'"  *Id*. at 2443 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761

(1998)).

     The court holds that a reasonable jury could not find that any of plaintiffs'

"supervisors" created or displayed the Coke Zero can.  Plaintiffs have adduced no evidence

regarding who was responsible for the Coke Zero can, contending only that "a black soda can

hung by a noose . . . hung in a Facilities Management common area beginning November

2010," and that it was viewed by managers, including Howerton, Lilley, Terry, and Womble.

Ps. Dallas Cnty. Mot. Resp. 6-7.  Because the evidence in the summary judgment record

would only enable a reasonable jury to find that the Coke Zero can was hung by a coworker,

to establish that Dallas County is liable on their hostile work environment claims, plaintiffs

must prove that Dallas County knew or should have known about the incident and failed to take prompt remedial action.

2

The court holds that plaintiffs have presented sufficient evidence to enable a reasonable jury to find that Dallas County at least should have known about the allegedly hostile work environment.[17]

"An employer has constructive knowledge of racial harassment 'if through the exercise of reasonable care it should have known what was going on but failed to address it,' or, in other words, '[i]f the harassment complained of is so open and pervasive that the employer should have known of it, had it but opened its corporate eyes.'" *Arrieta*, 2008 WL 5220569, at *27 (alteration in original) (quoting *Sharp v. City of Houston*, 164 F.3d 923, 930 (5th Cir. 1999)). For example, plaintiffs have adduced evidence that the Coke Zero can was hanging in the Facilities Management managers' office for up to six months and was viewed by Facilities Management managers and supervisors. *See* Ps. Womble Resp. App. 8 (Lawson averred that "[t]he *supervisors* left it there for about four months, somewhere between six weeks and six months." (emphasis added)); and *id.* at 44 (Garza stated that "[t]he managers did see [the Coke Zero can] because it was in their office and they did not say anything about it."). Plaintiffs have also introduced evidence that Lawson took a picture of the Coke Zero

---

[17]Because the court concludes that a reasonable jury could find that Dallas County had constructive knowledge, it need not decide whether Dallas County had actual knowledge. *See Arrieta*, 2008 WL 5220569, at *27 n.39.

- 34 -

can and complained about it directly to Sherry Batie ("Batie"), who worked in Human Resources.  The Dallas County Code permits employees to file harassment complaints by contacting, *inter alia*, the Human Resources/Civil Service Department.  *See* Dall. Cnty. Code § 86-785.  According to Lawson,

> [a]bout two weeks after Shannon Brown's interview, the lynched Coke can was hung in the engine room.  I took a picture of the can and complained to [Batie] in Human Resources.  I said the supervisors are trying to intimidate and bully me, and I showed her the photos, and she said, "Oh my God!"  [Batie] is a civil service administrator, and she is Black.  She was later fired.  She told me I had to watch myself because "they play dirty."

Ps. Womble Resp. App. 9.

As in *Arrieta*, plaintiffs do not rely on covert harassment, but on alleged harassment that a reasonable jury could find Dallas County would have known about in the exercise of reasonable care.  *Arrieta*, 2008 WL 5220569, at *27.  A reasonable jury could find that Dallas County at least should have known about the allegedly hostile work environment because, for example, the Coke Zero can was displayed in a location where it could easily have been viewed and was permitted to remain on display for up to six months.

3

The final question is whether a reasonable jury could find that Dallas County failed to take prompt remedial action.

"[D]etermining '[w]hether an employer's response to discriminatory conduct is sufficient will necessarily depend on the particular facts of the case,' such as the remedial

steps taken and the severity of the harassment." *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 437 (5th Cir. 2005) (quoting *Hirras v. Nat'l. R.R. Passenger Corp.*, 95 F.3d 396, 399-400 (5th Cir. 1996)) (some internal quotation marks omitted). "'Prompt remedial action must be reasonably calculated to end the harassment[.]'" *Id.* (quoting *Skidmore v. Precision Printing & Packaging Inc.*, 188 F.3d 606, 615-16 (5th Cir. 1999)).

A reasonable jury could find, for example, that the Coke Zero can was not removed until April 2011, approximately six months after its first appearance. Considering the evidence that the Coke Zero can was hanging in the Facilities Management managers' office and was thus viewable by plaintiffs' managers and supervisors beginning in November 2010, a reasonable jury could find that Dallas County failed to take prompt remedial action. *See, e.g., Rock-Tenn Servs.*, 901 F.Supp.2d at 828 (holding in context of *Ellerth/Faragher* affirmative defense that there was disputed fact issue concerning whether employer's response to complaints about racist graffiti was "prompt" when there was evidence that supervisors allowed graffiti to remain for months and even up to one year); *Arrieta*, 2008 WL 5220569, at *28 ("[The employer's] evidence of prompt remedial action consists largely of instances in which it painted over racial graffiti. Even if it is conceded that [the employer] removed graffiti on numerous occasions, there is a fact issue as to whether it did so promptly. Plaintiffs have offered evidence that some racially offensive graffiti went untouched for months.").[18]

---

[18]Dallas County argues that "the evidence establishes that when [Dallas] County did learn about any of these incidents it addressed them by investigating the complaints and, in

Accordingly, the court denies Dallas County's motion for summary judgment dismissing plaintiffs' hostile work environment claims.[19]

## V

Dallas County moves for summary judgment dismissing Dennis' race discrimination claim based on his February 2, 2011 termination, arguing that he cannot establish that Dallas County's articulated reason for terminating him is false and that the real reason for his termination is his race.  Plaintiffs respond that Dennis' termination constituted harassment on the basis of race and should be analyzed in the context of their harassment claims, not Dennis' discrimination claim.

Because plaintiffs appear to have abandoned the race discrimination claim based on Dallas County's February 2, 2011 termination of Dennis' employment, the court grants Dallas County's motion for summary judgment and dismisses this claim.

## VI

The court turns next to Dallas County's motion for summary judgment dismissing plaintiffs' claims that they were subjected to disparate, discriminatory treatment based on race.

_____

the case of the 2012 'white power' graffiti, by conducting polygraphs of all facilities employees, including management, to ascertain who had committed this act of vandalism." D. Br. 9.  Although this evidence may persuade the jury to find that Dallas County in fact took prompt remedial action, there is a genuine issue of fact in this respect.

[19]Dallas County objects to certain parts of plaintiffs' summary judgment evidence. Because the court is not relying on the evidence in question in deciding Dallas County's motion, it overrules the objections as moot.

A

"To establish a discrimination claim under Title VII or § 1981, a plaintiff must prove that he or she was subject to an 'adverse employment action'—a judicially-coined term referring to an employment decision that affects the terms and conditions of employment." *Thompson v. City of Waco, Tex.*, ___ F.3d ___, 2014 WL 4364153, at *1 (5th Cir. Sept. 3, 2014) (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281-82 (5th Cir. 2004)). "[A]dverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Id.* (citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 612 (5th Cir. 2007); *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007); *Pegram*, 361 F.3d at 282). "[A]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action." *Pegram*, 361 F.3d at 282 (quoting *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)).

Dallas County contends that, as to plaintiffs' "one allegation" that they were subject to disparate treatment because they were denied tools or received only inadequate tools while Caucasian employees had keys to get all the tools they needed, plaintiffs have failed to allege an "ultimate employment decision" and Dallas County is entitled to summary judgment.  D. Br. 8.

Plaintiffs respond that adverse employment actions are those that affect job duties, compensation, or benefits.  They maintain that their job duties were affected because they were given incomplete tool carts and did not have access to the Caucasian building

mechanics' fully-stocked tool carts and thus had to call Caucasian building mechanics to obtain the tools they needed, effectively preventing them from performing their jobs independently.  Plaintiffs also address their disparate treatment claims on which Dallas County did *not* move for summary judgment, pointing to evidence that harassment complaints made by African-American workers were ignored while harassment complaints made by non-African-American workers were investigated, and, where appropriate, disciplinary action was taken; African-American workers were given less time to prepare lunches than Caucasian employees, tardy policies were disparately applied to Clarence, and Lawson was required to call in every 30 minutes while non-African-American workers were not; and Dennis and Lawson were excluded from a staff meeting that similarly-situated Caucasian workers were invited to attend.

B

Plaintiffs argue that they have established an adverse employment action on the basis that they were given unequal access to tools.  They maintain that their "job duties were affected because they were required to do something they weren't hired to do: depend on and telephone call similarly situated white workers to effectively get permission to perform otherwise independent tasks."  Ps. Dallas Cnty. Mot. Br. 22.  The court disagrees that plaintiffs have presented evidence on this basis of an adverse employment action.

An adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Ellis v. Compass Grp. USA, Inc*., 2010 WL 4792668, at \*6 (E.D. Tex. Oct. 18, 2010) (citation omitted); *see also, e.g., Piercy v. Maketa*, 480 F.3d

1192, 1203 (10th Cir. 2007) (holding that actions that amount to a "mere inconvenience" do not constitute an adverse employment action); *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911, 912 (7th Cir. 2002) (holding that denial of "'better' equipment" did not amount to actionable adverse employment action).  Even if plaintiffs' job duties were affected by their unequal access to necessary tools, a reasonable jury could not find that this constituted an "ultimate employment decision," such as hiring, firing, demoting, promoting, granting leave, and compensating.  *See Thompson*, 2014 WL 4364153, at *1.

Plaintiffs' remaining grounds for their disparate treatment claims are these: plaintiffs' harassment claims were treated differently than were non-African-American employees' harassment claims; plaintiffs were given less time to prepare lunches; Dallas County's tardy policies were disparately applied to them; Lawson had to call in every 30 minutes when no Caucasian employee was required to do so; and Clarence and Lawson were excluded from staff meetings.  A reasonable jury could not find that any of these alleged actions constituted an "adverse employment action."  *See, e.g., Matthews v. City of Hous. Fire Dep't*, 609 F.Supp.2d 631, 645 (S.D. Tex. 2009) (holding that decisions to exclude employees from certain meetings were not "ultimate employment decisions"); *Wesley v. Yellow Transp., Inc.*, 2008 WL 5220562, at *2 (N.D. Tex. Dec. 12, 2008) (Fitzwater, C.J.) ("[R]eceiving unequal break times is not an actionable adverse employment action."); *Simmons v. Cadence Design Sys., Inc.*, 2007 WL 4104373, at *9 (N.D. Tex. Oct. 26, 2007) (Ramirez, J.) (noting that differential management, unwarranted job performance scrutiny, performance requirement standards, and ignoring complaints of disparate treatment were not adverse employment

actions), *rec. adopted*, 2007 WL 4104373 (N.D. Tex. Nov. 16, 2007) (Kinkeade, J.).

Accordingly, the court grants Dallas County's motion for summary judgment and dismisses plaintiffs' disparate treatment claims asserted against Dallas County.[20]

## VII

Dallas County also moves for summary judgment dismissing plaintiffs' retaliation claims.

## A

Plaintiffs allege retaliation claims arising under Title VII and § 1981. *See* 42 U.S.C. § 2000e-3(a); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (holding that 42 U.S.C. § 1981 "encompasses claims of retaliation"). Because plaintiffs rely on circumstantial evidence to support their retaliation claims, they must proceed under the familiar *McDonnell Douglas* burden shifting framework.[21]

---

[20]Dallas County only moves for summary judgment on plaintiffs' disparate treatment claims that are based on the alleged denial of equal access to tools. In its reply, however, Dallas County argues that "none of the Plaintiffs' other complaints about their on-the-job treatment are established by the evidence to have resulted in an adverse employment action against them." D. Reply Br. 12. Normally, the court does not address arguments raised for the first time in a reply brief because doing so effectively denies the nonmovant a fair opportunity to respond. *See, e.g., Conceal City, L.L.C. v. Looper Law Enforcement, LLC*, 917 F.Supp.2d 611, 623 (N.D. Tex. 2013) (Fitzwater, C.J.). Here, however, plaintiffs have already responded with their evidence of all alleged "adverse employment actions," including those on which Dallas County did not seek summary judgment. Even if plaintiffs were given a chance to respond to whether the conduct alleged in support of their disparate treatment claim constituted "adverse employment actions," they would be unable to establish that any of the alleged conduct constituted an "ultimate employment decision."

[21]As noted above, courts use the same legal framework to analyze plaintiffs' claims brought under Title VII and § 1981. *See DeCorte*, 497 F.3d at 437.

Plaintiffs must first demonstrate a prima facie case of retaliation by showing that (1) they engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action. *See, e.g., Walker v. Norris Cylinder Co.*, 2005 WL 2278080, at *9 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)).  As to the third element, the requirement that a plaintiff show at the prima facie case stage a "causal link" between a protected activity and an adverse employment action is "much less stringent" than the "but for" causation that a jury must find. *See Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *see also Khanna v. Park Place Motorcars of Hous., Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.) (characterizing this prima facie case burden as "minimal").

If plaintiffs establish a prima facie case, the burden shifts to Dallas County to articulate a legitimate, non-retaliatory reason for the alleged retaliatory action taken. *See Walker*, 2005 WL 2278080, at *9.  This burden is one of production, not of proof. *See Wooten v. Fed. Express Corp.*, 2007 WL 63609, at *16 (N.D. Tex. Jan. 9, 2007) (Fitzwater, J.), *aff'd*, 325 Fed. Appx. 297 (5th Cir. 2009).

If Dallas County meets its production burden, the burden shifts back to plaintiffs to produce evidence that retaliation for plaintiffs' protected conduct, rather than Dallas County's proffered legitimate non-retaliatory reason, was the "but-for cause" of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S.Ct. 2517, 2528 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was

the but-for cause of the challenged employment action."); *see also, e.g. Coleman v. Jason Pharms.*, 540 Fed. Appx. 302, 304 (5th Cir. 2013) (per curiam) ("An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action." (citing *Nassar*, 133 S.Ct. at 2533-34)).  "In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity."  *Coleman*, 540 Fed. Appx. at 304 (quoting *Long*, 88 F.3d at 308).

B

In their fourth amended complaint and Rule 7(a) reply, plaintiffs rely on the following to establish their retaliation claims: (1) the first appearance of the Coke Zero can was approximately two weeks after Lawson filed his discrimination complaint and Brown investigated the complaint; (2) after Lawson complained about the "fake metal teeth incident," Womble assigned him to "Kitchen Duty"; and (3) after Dennis filed an EEOC complaint alleging wrongful termination and race discrimination, he was forced to take a polygraph test regarding the "White Power" message appearing on the Decker Jail wall, he was falsely accused of distributing photographs of Womble and harassing individuals at Dallas County Human Resources, and the "Dennis Jones Rule" was established.[22]

---

[22]In their response brief, plaintiffs rely only on evidence regarding "Kitchen Duty" and the "Dennis Jones Rule" to establish their retaliation claim.  To the extent plaintiffs have asserted bases for their retaliation claims in their fourth amended complaint or Rule 7(a) reply and do not address them in their response brief, the court concludes that plaintiffs have abandoned these bases for their retaliation claims.

Dallas County contends that it is entitled to summary judgment concerning the allegation that Lawson was assigned to "Kitchen Duty" or "on-call" duty after he complained about the restructuring of Facilities Management because his complaint is not a protected activity under Title VII.  Regarding the other grounds on which plaintiffs rely, Dallas County maintains that plaintiffs cannot establish either that an adverse employment action was taken or that there was a causal connection between the protected activity and the allegedly adverse action.  Dallas County contends that there is no evidence that any of the individuals alleged to have retaliated against any plaintiff knew of the protected activity and took the action complained about because of the protected activity.

Plaintiffs respond that, around the time that Lawson filed a complaint about the "fake metal teeth" incident, Womble reassigned him to "Kitchen Duty," which required him to be on-call and included unstopping clogged toilets, "[a]s a penalty for expressing dissatisfaction."  Ps. Womble Resp. App. 6.  Plaintiffs posit that Dallas County enacted "the Dennis Jones Rule"[23] and enforced this rule in February 2013 only against Dennis.[24]

---

[23]According to plaintiffs' Rule 7(a) reply, "in August 2012, Dallas County Worker Jerome Price informed Plaintiff Dennis Jones that he was not to go to any other Dallas County building because of a new rule called, 'The Dennis Jones Rule.'"  Rule 7(a) reply 37.

[24]In their summary judgment response, plaintiffs contend that certain of the Individual Defendants ordered Dennis, under threat of termination, to take a polygraph test.  They contend that, during the deposition of Jerome Price ("Price") taken in this litigation, Womble was present and made it obvious to Lawson that he was texting Price's testimony to Lilley as it was being given, and that this "could well dissuade a reasonable person from pursuing the discrimination complaints due to fear of reprisal at work."  Ps. Dallas Cnty. Mot. Resp. 16.  In their summary judgment response brief, however, plaintiffs do not rely on this evidence to argue that they were subjected to retaliation.  In any event, plaintiffs have not

C

Plaintiffs contend in their summary judgment response brief that, "after Lawson complained about the Fake Metal Teeth incident," Womble "re-assigned [him] to Kitchen Duty, including cleaning floors flooded with wastewater from clogged jail toilets."  Ps. Dallas Cnty. Mot. Br. 24.  The evidence on which they rely, however, does not support their contentions.  Lawson avers that, when Womble was made Assistant Manager of Quality Assurance and Lilley was made Manager, "I expressed my dissatisfaction with the situation. As a penalty for expressing dissatisfaction, the managers put me on Kitchen Duty[.]"  Ps. Womble Resp. App. 6.  He does not assert that he was assigned "Kitchen Duty" after complaining about the "fake metal teeth incident."  And a reasonable jury could not find that Lawson's "express[ing] dissatisfaction" with Dallas County's restructuring of upper management constituted activity protected under Title VII or § 1981.  Although Lawson appears to have been dissatisfied with Dallas County's putting Womble and Lilley in charge of the newly-formed Quality Assurance Department, rather than Jesse Derritt (who is African-American), plaintiffs have produced no evidence that Lawson specifically complained regarding the racial makeup of the Quality Assurance Department versus their lack of qualifications.  *See id.*  Moreover, plaintiffs have produced nothing, other than

---

presented any evidence that would enable a reasonable jury to find a causal connection between any protected activity and Dennis' being forced to take a polygraph test or Womble's being present during Price's deposition.  In other words, a reasonable jury could not find that plaintiffs' conduct was the but-for cause of the allegedly retaliatory acts.  *See Nassar*, 133 S.Ct. at 2534.

Lawson's unsupported assertion that he was placed on "Kitchen Duty" "as a penalty for expressing dissatisfaction," from which a reasonable jury could find that Lawson's protected conduct—either filing a complaint with Batie regarding the "fake metal teeth incident" or expressing dissatisfaction with the new management in the Quality Assurance Department—was the "but-for cause" of Lawson's reassignment. *See Nassar*, 133 S.Ct. at 2534. Plaintiffs appear to rely only on the allegation that Lawson was reassigned to "Kitchen Duty" "after [he] complained about the Fake Metal Teeth incident," Ps. Dallas Cnty. Resp. Br. 24, but they fail to provide any evidence that would support a reasonable finding that the two events were closely related in time or otherwise causally linked.[25] Accordingly, the court grants Dallas County's motion for summary judgment on plaintiffs' retaliation claim based on Lawson's being assigned to work "Kitchen Duty."

To the extent plaintiffs base their retaliation claims on the institution of the "Dennis Jones Rule," they fail to present any evidence that would enable a reasonable jury to find causation. The only evidence that plaintiffs present is a single page from the deposition of Jerome Price ("Price") in which Price states that the "Dennis Jones Rule" was "basically, set

---

[25]The only dates plaintiffs provide in connection with their retaliation claims are Lawson's statement that "[a]round 2008 or 2009 was when Dale Lilley and David Womble were organizing themselves into a cohesive unit to intimidate Blacks and other minorities," Ps. Womble Resp. App. 6, and their evidence that, some time after November 2010, Lawson filed a complaint with Batie related to the fake metal teeth incident, *id.* at 28. Plaintiffs provide no evidence regarding the date on which Lawson was assigned to "Kitchen Duty."

up to keep Dennis Jones out of supply down there."  Ps. Womble Resp. App. 80.[26]  This evidence is insufficient to permit a reasonable jury to find that the "Dennis Jones Rule" was implemented in close temporal proximity to Dennis' instituting this litigation, or that it was in any other way causally related to the filing of this lawsuit.  In other words, no reasonable jury could find from the evidence on which plaintiffs rely that Dennis' filing of this lawsuit was the but-for cause for implementing the "Dennis Jones Rule."  *See Nassar*, 133 S.Ct. at 2534.  Accordingly, the court concludes that Dallas County is entitled to summary judgment dismissing plaintiffs' retaliation claims based on the "Dennis Jones Rule."

## VIII

The court also dismisses plaintiffs' official-capacity claims against the Individual Defendants.  It is clearly established that a suit against a government official in his or her official capacity is "only another way of pleading an action against an entity of which [the official] is an agent."  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 n.55 (1978).  "As long as the government entity receives notice and an opportunity to respond, an 'official-capacity suit' is . . . treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Plaintiffs' official-capacity claims are therefore duplicative of the claims against Dallas County and should be dismissed.  *See, e.g., Palo ex rel. Estate of Palo v. Dallas Cnty.*, 2006 WL 3702655, at *8 (N.D. Tex. Dec. 15, 2006) (Fitzwater, J.)

---

[26]On this same deposition page, Price was asked, "So it was base – you have a rule that's implemented after Mr. Jones brings an action against the county," Ps. Womble Resp. App. 80, but plaintiffs fail to include Price's response to this question.

(dismissing § 1983 claims against sheriff sued in his official capacity as duplicative of claims against county).

\* \* \*

The court grants the Individual Defendants' motion for summary judgment and dismisses the actions against them by Rule 54(b) final judgment; it dismisses plaintiffs' official-capacity claims against the Individual Defendants; and it grants Dallas County's summary judgment motion as to all of plaintiffs' claims except their hostile work environment claims.

**SO ORDERED**.

September 18, 2014.

_____

SIDNEY A. FITZWATER
CHIEF JUDGE